[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13624

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

GHASAN AWAD,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cr-00188-SDM-SPF-1

_____

Before ROSENBAUM, JILL PRYOR, and TJOFLAT, Circuit Judges.

PER CURIAM:

Ghasan Awad appeals his twenty-seven-month sentence for convictions of conspiracy to defraud the United States, wire fraud, and trafficking in food stamps. His primary argument is that the District Court erred in estimating the amount of loss resulting from his food stamp trafficking by considering the sales of comparator grocery stores. We hold that the District Court did not commit clear error in its calculation. The District Court's approach was supported by reliable and specific evidence and the loss amount represented a reasonable estimate given the available information. Accordingly, we affirm.

## I.

The Supplemental Nutrition Assistance Program ("SNAP"), commonly called food stamps, is a federal program designed to provide food assistance for families in need. SNAP recipients may use their benefits for eligible items like food and household goods, but not for ineligible items like alcohol, tobacco, or cash. SNAP-authorized stores can lose their authorization for trading a recipient's benefits for cash, a practice known as "trafficking."

In 2014, the Food and Nutrition Service ("FNS") permanently disqualified Awad from participating as a SNAP-authorized retailer because the U.S. Department of Agriculture ("USDA") discovered trafficking at Awad's store, Express Meat Market ("EMM"). Under USDA regulations and SNAP rules, EMM's

SNAP authorization would terminate if Awad remained involved in the business in any capacity. To circumvent this, Awad conspired with codefendants Ahmad Al Saleh and Bassam Al Saleh to deceive the USDA, FNS, and SNAP by fraudulently transferring ownership of EMM to Ahmad, renaming EMM as Express *Family* Meat Market ("EFMM"), and obtaining SNAP authorization.[1] In reality, Awad continued to manage EFMM.

After the store's transfer, EFMM's monthly SNAP redemptions began far exceeding the average for similar stores. This prompted an investigation where an undercover agent went to EFMM to exchange SNAP benefits for cash three times. All the exchanges were similar: The agent entered EFMM and approached Awad at the register. The agent placed a few small items on the counter and asked Awad if he could exchange her SNAP benefits for cash. Awad then executed a SNAP purchase far exceeding the value of the items and gave the agent cash. Awad profited

---

[1] To pull this off, Awad, Ahmad, and Bassam submitted falsified documents to the USDA, including a one-page "Bill of Sale" for EMM, signed by Awad and Ahmad, witnessed by Bassam, claiming a $35,000 sale price, a $5,000 down payment, and $2,000 monthly installment payments. They also submitted forged receipts purportedly showing Ahmad's payments to Awad. Next, Ahmad, assisted by Bassam, submitted FNS Form-252 to obtain SNAP authorization for EFMM, falsely declaring himself as the sole owner and denying any SNAP-related violations for *anyone* associated with EFMM. This form was approved, and EFMM gained SNAP participation.

from these transactions by executing a large enough purchase to keep some of the cash for himself.

Awad was indicted and pleaded guilty to all counts. This included one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 1); three counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 2–4); and three counts of trafficking in food stamps, in violation of 7 U.S.C. § 2024(b)(1) (Counts 5–7).

Before sentencing, the District Court held a two-day evidentiary hearing to determine the amount of loss. Both parties submitted memoranda on the loss calculation. The Government argued that the loss should include all of EFMM's SNAP sales from October 2015 to October 2019 because Awad was permanently disqualified as a SNAP retailer during that time.[2] Alternatively, the Government proposed using the difference between EFMM's SNAP sales and the sales at comparator stores to estimate the loss. Awad responded that the proposed stores were not comparable, and the Government failed to meet its burden to provide reliable and specific evidence.

The District Court opted to calculate the loss under the comparator-store method because it was the most achievable and accurate given the evidence available. From the comparators proposed by Awad and the Government, the District Court identified

---

[2] On January 6, 2015, the USDA affirmed the permanent disqualification of Awad.

three stores similar in size to EFMM that operated during most of the relevant period—Kings Meat Market, Coquina Market, and Rajax Food Mart.  However, Kings was excluded as an outlier because it accepted about $500,000 in SNAP purchases during the relevant period, compared to nearly $1,500,000 each for Coquina and Rajax.[3]  The District Court then averaged the SNAP purchases from Coquina and Rajax, resulting in $1,468,405.16, and deducted this amount from EFMM's SNAP sales during the same period, which were $2,122,907.44.  Therefore, the District Court concluded in its order a loss estimate of $654,502.28.

Following this order, the probation officer issued a revised PSI, which calculated the base offense level as seven.  A fourteen-level enhancement was applied under U.S. Sent'g Guidelines Manual ("U.S.S.G.") § 2B1.1(b)(1)(I) (U.S. Sent'g Comm'n 2018) because the offense involved a loss ranging from $550,000 to $1,500,000.  A two-level increase was also applied under U.S.S.G. § 2B1.1(b)(9)(C) because the offense violated a prior administrative order—Awad was permanently disqualified from participating in SNAP but continued under a different store name.  Finally, a three-level reduction was given under U.S.S.G. § 3E1.1(a) and (b) for acceptance of responsibility, resulting in an offense level of twenty.  Awad had no prior criminal convictions, so he was placed in criminal history category I.

---

[3] Even if the calculation included Kings as a comparator, the resulting loss estimate would have warranted the same fourteen offense-level increase under U.S. Sent'g Guidelines Manual § 2B1.1(b)(1) (U.S. Sent'g Comm'n 2021).

Ultimately, this yielded a guideline imprisonment range of thirty-three to forty-one months.  In Awad's Sentencing Memorandum, he objected to the loss calculation as reflected in his Loss Calculation Memorandum.  At sentencing, the District Court adopted the guideline range recommended in the PSI but gave Awad a downward variance under 18 U.S.C. § 3553(a).  This resulted in a sentence of twenty-seven months of imprisonment and three years of supervised release.

## II.

Awad argues that the District Court committed clear error in estimating the loss amount of $654,502.28 because it lacked reliable and specific evidence to support it.  He contends that the District Court should have based its estimate on EFMM's financial records and cites our unpublished opinion in *United States v. Lulseged*, 688 F. App'x 719, 724 (11th Cir. 2017) (per curiam) (unpublished) as support.

Awad claims that the comparator-store method is unreliable because it ignores several variables impacting a grocery store's sales, like operating hours, stock availability and variety, delivery options, and customer loyalty.  He also insists that the Government failed to meet its burden of proof because its investigation did not recover financial records, which Awad believes could have provided a more accurate loss determination.  Awad also says that the Government's undercover investigation only established a loss of $524.25, which should be the basis for his sentencing guidelines.

The Government maintains that the District Court did not commit clear error because its estimate under the comparator-store method was reasonable based on the available evidence. The Government also says that this estimate was generous to Awad because the District Court could have included every dollar of SNAP sales made during the relevant period, and the comparator stores used were flagged for suspicious SNAP transactions. Finally, the Government argues that Awad's failure to maintain financial records made other loss-estimate methods unworkable and that Awad should not benefit from his failure.

Awad replies that there is no evidence of his failure to maintain records; only that records were not found in EFMM. He says that the Government's inadequate investigation is responsible for the lack of evidence, and this should not be used against him. Finally, Awad challenges the reliability of the comparator-store method here because the District Court used only two comparator stores and they differed from EFMM in terms of hours and clientele.

### III.

We review a district court's loss calculation for clear error. *United States v. Cavallo*, 790 F.3d 1202, 1232 (11th Cir. 2015). "We will overturn a court's loss calculation under the clear-error standard where 'we are left with a definite and firm conviction that a mistake has been committed.'" *United States v. Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014) (quoting *United States v. Crawford*, 407 F.3d 1174, 1177 (11th Cir. 2005)). "The sentencing judge

is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." *Id.* at 1301 (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)).

For fraud-related offenses, the Sentencing Guidelines increase a defendant's offense level based on the extent of the loss resulting from the fraud. *See* U.S.S.G. § 2B1.1(b)(1). In cases involving government benefits, the loss is determined as "not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses." *United States v. Maxwell*, 579 F.3d 1282, 1306 (11th Cir. 2009) (quoting U.S.S.G. § 2B1.1 cmt. n.3(F)(ii)). A defendant faces a fourteen-level enhancement if his offense results in a loss exceeding $550,000 but less than or equal to $1,500,000. *See* U.S.S.G. § 2B1.1(b)(1)(H)–(I).

The government bears the burden of proving the losses attributed to the defendant by a preponderance of the evidence. *Cavallo*, 790 F.3d at 1232. The Sentencing Guidelines do not require exactness but only that the sentencing court "make a reasonable estimate of the loss, given the available information." *Id.* (alteration in original) (quoting *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011)). The method for estimating loss in a particular case is highly fact-dependent, granting district courts considerable discretion in their approach. *See Campbell*, 765 F.3d at 1301. That said, the district court must support its chosen method with reliable and specific evidence. *Id.*

This Court has not directly addressed the use of comparator stores to calculate loss from the trafficking of food stamps. In an unpublished opinion, we affirmed a district court's use of a "vendor-based" method in a food-stamp-trafficking case. *See Lulseged*, 688 F. App'x at 724–25 (11th Cir. 2017) (unpublished). But the Eighth Circuit has upheld a loss calculation that used comparator stores. *See United States v. Aden*, 830 F.3d 812, 816 (8th Cir. 2016). And the Sixth Circuit has also done so, albeit in an unpublished opinion. *United States v. Sufi*, 455 F. App'x 672, 676 (6th Cir. 2012) (unpublished).

The District Court's calculation of the loss amount under the comparator-store method did not constitute clear error. The District Court's task was not to pinpoint the exact amount of loss but to arrive at a reasonable estimate given the information available. *See Cavallo*, 790 F.3d at 1232. The District Court considered several methods suggested by the parties to estimate the loss before determining that the comparator-store method was the "most achievable" and likely to yield the most accurate estimate based on the evidence available. After carefully reviewing the record, we are not left with a "definite and firm conviction that a mistake has been committed." *See Campbell*, 765 F.3d at 1302.

Furthermore, the District Court's loss calculation was supported by "reliable and specific evidence." It resulted from a two-day evidentiary hearing and the consideration of memoranda from both parties. When performing this calculation, the District Court only used comparator stores that closely mirrored EFMM in terms

of size, geographic area, SNAP participation during the relevant period, and SNAP purchase volumes. Accordingly, the District Court's loss calculation was supported by reliable and specific evidence, and its estimate was reasonable given the available information.

**AFFIRMED.**